*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1744**

Terry Anne Boggs, petitioner,
Respondent,

vs.

David Carl Boggs,
Appellant.

**Filed May 4, 2015
Affirmed
Minge, Judge***

Wright County District Court
File No. 86-CV-14-2459

Kathryn A. Graves, Benjamin J. Hamborg, Henson & Efron, P.A., Minneapolis,
Minnesota (for respondent)

Lee A. Hutton, III, Zelle Hofmann Voelbel & Mason LLP, Minneapolis, Minnesota (for
appellant)

Considered and decided by Smith, Presiding Judge; Chutich, Judge; and Minge,

Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**MINGE**, Judge

Appellant David Carl Boggs challenges the district court's grant of respondent Terry Anne Boggs's petition for a harassment restraining order (HRO), arguing that the evidence is insufficient to establish harassment.  We affirm.

**FACTS**

Married for twenty years, the parties begin divorce proceedings in March 2014. They have two residences, one in Minnesota and one in Arizona.  At the time of the HRO proceedings, appellant husband lived in Arizona with the parties' minor son, and respondent wife lived in Minnesota with the parties' minor daughter.  Appellant owns the Minnesota property but agreed that respondent would reside there until May 2014. Appellant's business operates a horse farm with stables in the vicinity of and at the Minnesota residence.  Several vehicles are titled in the business name, including the one driven by respondent.  S.O. is an employee of the business and is responsible for maintaining the stables and vehicles and caring for the horses.  In the winter and during times relevant to this matter, there were no horses at the stables.  The horses were in Arizona.

On May 15, 2014, respondent filed a petition for an HRO against appellant. Respondent alleged that appellant physically assaulted her, had S.O. follow and stalk her, monitored her social life, had a tracking device attached to the vehicle she used, made threats to her, and frightened her with threatening behavior.  Respondent stated in the petition that the conduct made her feel like she was "being persecuted and followed, and

2

treated like a fugitive. I have no privacy or protection from [appellant]. I do not feel safe being alone at my home anymore." The district court granted an ex parte HRO. Appellant contested the order.

The district court held an evidentiary hearing on the HRO with testimony from both parties and one other witness. Respondent testified that, during an argument in May 2014, appellant grabbed her arms, she elbowed him, they both fell, and she sustained bruises. Respondent also testified that employee S.O. came to her Minnesota residence without her knowledge or consent on multiple occasions in March and April 2014, that his presence was pursuant to the direction of appellant, and that appellant was tracking her vehicle through the use of OnStar Family Link GPS services. Respondent further pointed out that she had a male friend and that appellant attempted to monitor her activities with that individual and restrict his presence at the Minnesota residence.

Appellant testified that as the owner he had a legitimate business interest in the use, care, and maintenance of the Minnesota residence and nearby stables, that S.O. frequently goes to the Minnesota residence because his job requires that he maintain the property and stables, and that as the owner he communicated with S.O. regarding the premises. Appellant stated that he did not intend for S.O. to engage in any stalking of respondent. Appellant also testified that all of the business vehicles had OnStar services and that the vehicle used by respondent was not treated differently.

The district court granted respondent an HRO, finding that appellant did not physically assault respondent but that appellant "intentionally engaged in repeated incidents of intrusive or unwanted acts." This appeal follows.

3

**D E C I S I O N**

We review the district court's grant of an HRO for abuse of discretion. *Kush v. Mathison*, 683 N.W.2d 841, 843 (Minn. App. 2004), *review denied* (Minn. Sept. 29, 2004). To find an abuse of discretion, we "must conclude that the district court erred by making findings unsupported by the evidence or by improperly applying the law." *State v. Underdahl*, 767 N.W.2d 677, 684 (Minn. 2009). The district court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01.

An HRO may be granted if "there are reasonable grounds to believe that the [subject of the HRO] has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3) (2014). Harassment includes "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another." *Id.*, subd. 1(a)(1) (2014). To sustain an HRO petition, the petitioner must prove "objectively unreasonable conduct or intent on the part of the harasser" and "an objectively reasonable belief on the part of the [harassed] person" that such conduct has a substantial adverse effect on her safety, security, or privacy. *Peterson v. Johnson*, 755 N.W.2d 758, 764 (Minn. App. 2008) (quotations omitted). Here, the district court found that appellant "intentionally engaged in repeated incidents of intrusive or unwanted acts" that established the "objectively unreasonable" requirements. The court cited four incidents to support the issuance of the HRO.

4

**Incident #1**

The district court found that, in March 2014, appellant instructed S.O. to investigate the area around respondent's residence after S.O. reported that motorcycles were at the house and that there were signs of a party. Appellant testified that S.O.'s report of motorcycles and other indications that a party was occurring at the Minnesota residence led him to worry that "there may be alcohol or damage to my property." Appellant testified that it was part of S.O.'s job "to check on the property on almost a daily basis . . . . Horses eat on holidays, so you're on properties and work 24/7 in the horse business." Respondent testified that the horses were in Arizona for the winter, that the stables were empty in March and April, and that normally "employees do not come to the Minnesota home anytime over the winter. There's zero reason for them to do that." The district court found that with the horses in Arizona, some of S.O.'s presence on the property and communications with appellant constituted harassment monitoring by appellant of respondent and of her residence.

**Incident #2**

The district court found that S.O. reported to appellant that a "strange vehicle" was leaving the Minnesota residence on the evening of April 23, 2014, and that appellant instructed S.O. to go to the property to look around. Appellant testified that while S.O. was "checking on the property, or going by or something," S.O. called appellant to inform him that a strange car was in the driveway. Appellant testified that he asked S.O. to obtain the license-plate number of the strange car and that S.O. subsequently told appellant that the car belonged to a friend of the parties' minor daughter. After dark,

while S.O. was investigating the car, the daughter saw him in the shrubbery and became frightened that an intruder was on the property because she did not know that it was S.O. Appellant stated that he did not intend for S.O. to stalk respondent. Respondent testified that her daughter called her at 9:00 p.m., crying and scared because of "a car in the driveway that had followed her friends and then returned to the driveway."[1] Respondent testified that her daughter then observed S.O. hiding between two trees in front of the garage. Respondent testified that it frightened her to learn that S.O. was following her daughter's friends. The district court found appellant's testimony that S.O. "just happened to be in the area . . . when he saw the strange vehicle" was not credible and found that appellant directed S.O. to observe the property and respondent and report his observations back to appellant.

**Incident #3**

Appellant testified that the next day, April 24, 2014, S.O. "was checking out the property" and reported to appellant that there was "a strange white van" at the residence. Appellant asked S.O. to get the license-plate number or find out why it was there. S.O. reported back to appellant that respondent had requested a security-system firm come to work on the locks at the residence. Appellant testified that "there was no need for her to change any locks" because respondent was vacating the residence in May. Respondent testified that she requested security maintenance because "the actual security alarm to the home hadn't been working . . . and the children had asked me for their security to please reconnect the security system." Respondent testified that the security-system employee

---

[1] The district court properly noted that whether S.O. frightened the daughter was irrelevant because the HRO was not on behalf of the daughter.

called her saying S.O. had told him to leave and had followed him down the road. Respondent also testified:

> It's unsettling . . . why are they watching me, what are they waiting for. You know, was [appellant] waiting for me to be alone or what? Why wouldn't I be allowed to protect my children in our home? It doesn't make sense to me. None of it made sense to me. It was very undermining and scary to be honest with you.

The district court found that appellant sent S.O. to the property to monitor respondent's activities and report back to him. The district court found that appellant's testimony that he was simply concerned for his property was not credible. The district court again found respondent's testimony credible, that S.O. did not need to be at the property during the winter months, and that it was reasonable that respondent felt that it was unsettling, undermining, and scary to know that S.O. was monitoring the property and herself.

**Incident #4**

The district court found that in April 2014, appellant, or someone at his direction, arranged for the activation of the OnStar Family Link GPS tracking service on the vehicle that respondent was driving. Appellant testified that his assistant, N.W., used OnStar "to know where the vehicle was" because it belonged to his business, and the intent was not to follow respondent. Respondent testified that she spoke to an OnStar representative, who informed her that appellant arranged to have the OnStar Family Link GPS tracking service activated on April 8, 2014. Respondent testified that she was scared and felt violated by appellant tracking her movements. The district court found that appellant's business owned the vehicle but that respondent had exclusively driven the vehicle except

7

for two occasions. The district court found that appellant "had no reason to activate the OnStar Family Link other than to track [respondent's] movements." The district court found that tracking respondent's movements by using the OnStar capabilities invaded respondent's privacy.

*District Court's Reliance on Text Messages Received on iPad*

Appellant objected to evidence of text messages between appellant and N.W. to show that appellant tracked the vehicle's location. Appellant argued that respondent illegally intercepted the text messages without appellant's knowledge. Both parties testified that appellant owns two iPads and that respondent uses appellant's older iPad. The older iPad uses the data plan associated with appellant's mobile phone and receives text messages intended for appellant. When this occurs, respondent sees the text messages without appellant's knowledge. Respondent testified that she usually told N.W. when she saw text messages to or from appellant, but when she received the text messages between appellant and N.W. that indicated that appellant was tracking respondent's movements in her vehicle, she did not tell N.W.

Appellant argued to the district court that respondent's "interception" of his text messages constituted a criminal act and that respondent did not have an "expectation of privacy" under the Fourth Amendment while driving the vehicle. The district court found that these arguments relied on inapplicable legal authority. Appellant has not raised these arguments on appeal, and therefore we do not address them. *See Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn. 1982) (holding that arguments not briefed on appeal are not properly before an appellate court).

8

On appeal, appellant argues that the Federal Electronic Communications Privacy Act (ECPA) prohibits respondent's receipt of the text messages, and therefore the district court erred by relying on the text-message evidence to find that appellant harassed respondent through tracking the vehicle. Appellant did not make this argument to the district court. This court will not consider matters not argued to and considered by the district court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988).

Even if this issue were properly before us, the ECPA prohibits the *intentional interception* of an electronic communication. 18 U.S.C. § 2511 (2012). Nothing in the record here demonstrates that respondent *intentionally* obtained appellant's electronic communication or that she *intercepted* the text messages. Instead, the district court found that "the text messages automatically 'pop up' when [respondent] is working on the iPad," which indicates that respondent inadvertently received the text messages. In these circumstances, the district court did not err in considering the testimony regarding the text messages when it found that appellant's tracking of respondent's vehicle was an intrusive or unwanted act.

**Appellant's Property Interest**

The issue before this appellate court is not how we would decide this case if we were trial court judges. We recognize that appellant has a legitimate property interest in the Minnesota residence, which he owns, in his business property at that location, and in the business-owned vehicle being driven by respondent. Appellant could legitimately instruct S.O. to enter the property in order to properly maintain the premises and check on its use without those instances rising to the level of harassment. At the same time we

acknowledge that such checking and maintenance may be harassing conduct and that the ownership interest may be a pretext or cover for such conduct.

The district court heard testimony from both parties, assessed the credibility of the witnesses, and found respondent's testimony to be credible. Appellant's property interest claims must be weighed against respondent's interest to be free from harassment. When asked why she petitioned for an HRO, respondent testified, "I just needed it to stop, I was sick of living like a fugitive, and . . . being followed everywhere I went made me feel that way." We defer to the district court's determination of witness credibility. *Peterson*, 755 N.W.2d at 763 (stating, in an appeal from grant of an HRO, that "[c]redibility determinations are the province of the trier of fact"). Giving due deference to the district court's credibility determinations and after a careful review of the record, we conclude that sufficient evidence supports the district court's findings that the four incidents constitute objectively unreasonable intrusive or unwanted acts.

Because the record supports the district court's findings and because its findings support the conclusion that appellant intentionally engaged in repeated incidents of intrusive or unwanted acts that had a substantial adverse effect on respondent's safety, security, or privacy, we conclude that the district court did not abuse its discretion in issuing the HRO.

**Affirmed.**